JENNIFER LARSON, BY AND THROUGH HER FATHER AND NEXT FRIEND, DAVID LARSON, APPELLANT, V. HOMETOWN COMMUNICATIONS, INC., AND HOMETOWN OPERATIONS, INC., DOING BUSINESS AS THE FREMONT TRIBUNE, AND MARYLAND CASUALTY INSURANCE COMPANY, APPELLEES.

526 N.W.2d 691

Filed January 24, 1995.    No. A-94-183.

Robert T. Cannella, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., and Stephen L. Gerdes for appellant.

Joseph W. Grant, of Gaines, Mullen, Pansing & Hogan, and Walter E. Zink II, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellees.

Kenneth C. Stephan, of Knudsen, Berkheimer, Richardson & Endacott, and L. Michael Zinser, of Zinser and Domina, for amici curiae Nebraska Press Association and Nebraska Daily Press Association.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

HANNON, Judge.

Jennifer Larson, a 12-year-old girl, was struck by an automobile while she was delivering daily newspapers for Hometown Communications, Inc., the publisher of the Fremont Tribune. As a result of the accident, Jennifer is in a persistent vegetative state. Through her father and next friend, David Larson, Jennifer filed an action to recover workers' compensation benefits. At the initial hearing before a single judge of the Workers' Compensation Court, the only issue tried was whether Jennifer was an employee or an independent contractor of the Fremont Tribune when she delivered the papers. The trial judge analyzed the evidence in a lengthy opinion and concluded that the control exercised by the Fremont Tribune over its newspaper carriers was sufficient to make Jennifer an employee. The review panel reversed the

order of the trial judge, and Jennifer appeals to this court. We conclude that there is sufficient evidence to support the trial judge's finding. Accordingly, we reverse the judgment of the review panel and order the trial judge's award to be reinstated.

## STATEMENT OF FACTS

The Fremont Tribune newspaper is published 6 days a week, Monday through Saturday. In February 1991, its circulation was 11,810 newspapers with 9,688 home subscribers. Sixty-four percent of the home subscribers had their paper delivered by a carrier on foot or bicycle. The evidence shows that between 25 and 52 percent of subscribers paid in advance to the Fremont Tribune, rather than paying the carrier, who collected from house to house once a month.

The newspaper route Jennifer was working on February 22, 1991, was nominally Valerie Brauner's route. However, as will be explained, the girls had divided the route with the blessing of the Fremont Tribune.

On July 20, 1989, Valerie executed an agreement with the Fremont Tribune to deliver papers along the route in Cedar Bluffs, Nebraska. The agreement was entitled "Independent Carrier Agreement" and stated:

> The Company agrees to sell, and the Carrier agrees to purchase sufficient quantities of newspapers to cover the delivery schedule, together with such additional quantities of newspapers as the Carrier may require in conducting his independent business of selling and delivering the Company's newspapers.
>
> . . . .
>
> . . . It is understood that the carrier is free to engage in other business activities, but he agrees that the Company's newspapers will be delivered in a timely manner in accordance with said delivery schedule.

The Fremont Tribune furnished Valerie with a "Carrier Hand Book," a subscription receipt card to keep track of collections from customers, a collection calendar which set forth the days when collections must be made by carriers and the date upon which a carrier's balance for newspapers must be paid to the Fremont Tribune, and a "Vacation Handbook for Your

Substitute."

The Carrier Hand Book states that "you are not an employee of the Tribune but an Independent Contract Merchant." The handbook states duties and requirements the carrier must follow. For example, the handbook states that "[t]he Fremont Tribune guarantees its customers home delivery of their paper before 5 p.m. . . . . Papers should be delivered before 5 p.m. daily and before 7 a.m. on Saturdays and Holidays." In addition, the handbook states that the carriers are required to deliver "Shoppers" to all nonsubscribers along their route on Tuesdays, for which the carriers are paid on a per-piece basis. In addition, the carriers were told that it was possible that on certain days the carriers would receive inserts and that "[t]hese need to be put inside your papers before you deliver them." The handbook states that a carrier must "[n]ever let papers pile up!!! If you notice papers piling up for more than 3 days, call in a stop." Finally, the handbook states:

Going on vacation and can't do your route? Find a substitute to do it for you.

The paper route is your business, if you can't be there to take care of it find a friend to take care of it while you are gone.

Call the office with the substitute's name, address and phone number so we know who is in charge while you are gone.

The Vacation Handbook for Your Substitute states:

Any time while you're on vacation it is very important that a well trained substitute properly manages your route. This booklet is designed to provide your substitute with basic information about managing a Tribune Newspaper Route while you're vacationing. Review the entire booklet with your substitute step by step[.]

Valerie testified at trial that because she had difficulty completing the route on Tuesdays and Wednesdays because of personal obligations, and because she was tired of managing the entire route by herself, she asked Jennifer to split the route with her. Valerie and Jennifer, along with their mothers, agreed that Jennifer and Valerie each would deliver half the route on Tuesdays and Wednesdays, and then each would deliver the

entire route every other week on Mondays, Thursdays, Fridays, and Saturdays. Valerie agreed to handle collecting the cost of subscriptions from all the customers, in exchange for which she would be entitled to the $10 per month the Fremont Tribune automatically billed her and placed in a bank account. The $10 per month was retained by the Fremont Tribune as a deposit to cover any indebtedness carriers may incur, and the balance in the bank account was returned to the carriers when they surrendered their route to the Fremont Tribune. Valerie's mother wrote to the Fremont Tribune in August 1990, notifying the paper that Jennifer and Valerie would be sharing the route. In addition, a flier was given to each subscriber on Valerie's route, informing them that Jennifer and Valerie would be responsible for splitting the route.

Kathy Brown, the district sales manager for the Fremont Tribune's out-of-town routes, testified that as part of her duties she was required to supervise over 70 carriers. Brown had the power to reconfigure the routes and add and subtract subscribers. If there was a route for which the Fremont Tribune did not have a carrier, it was Brown's duty to deliver the papers on that route herself. In addition, if a customer received a paper which was wet, the customer was provided with a replacement paper, for which the responsible carrier was not charged.

Brown testified that carriers were told what to charge the subscribers and what the Fremont Tribune would charge the carriers for the newspapers. When the carriers collected the subscription price, they were told by the paper to tell the subscriber "you are from the Fremont Tribune." If a customer refused to pay the carrier, Brown would call the customer to find out if there was a problem. If Brown determined that the customer had refused to pay without cause, she instructed the carrier to stop delivering the paper. Brown did not allow the carriers to bring in their payments, after collecting the subscription price from the customers, at any other time than that determined by the Fremont Tribune.

Carriers received a monthly statement, which had columns for charges, credits, and the balance. In the charges column were charges for such items as the newspapers delivered, rubberbands, and the deposit of $10. In the credit column were

credits for customers who paid the Fremont Tribune directly for their subscriptions, credits for papers delivered to Fremont Tribune employees, and payment for delivery of the "Shoppers." Every month after collection time, carriers were required to remit to the Fremont Tribune the balance which appeared on the monthly statement, which was the charge for the newspapers and other items less the credits each carrier received.

Through her father and next friend, Jennifer filed a petition for workers' compensation benefits from the Fremont Tribune. The trial court found that Jennifer was an employee, and not an independent contractor, of the Fremont Tribune and awarded Jennifer workers' compensation benefits and medical costs. The Fremont Tribune appealed to the review panel of the Workers' Compensation Court, which reversed the trial court's order, finding that as a matter of law, Jennifer was an independent contractor of the Fremont Tribune. Jennifer appeals the review panel's order.

## ASSIGNMENTS OF ERROR

Jennifer alleges that the review panel erred by (1) exceeding its powers when it reversed the trial court's factual finding that she was an employee of the Fremont Tribune, (2) rendering a decision not supported by competent evidence when it found she was bound by the Independent Carrier Agreement executed between Valerie and the Fremont Tribune, (3) exceeding its powers in making a factual finding that Valerie and Jennifer were engaged in a joint venture and that there was no contract of employment between them, and (4) dismissing Jennifer's claim that the Fremont Tribune was her statutory employer.

## STANDARD OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the award. *Pearson v. Lincoln Telephone Co.*, 2 Neb.

App. 703, 513 N.W.2d 361 (1994).

The Workers' Compensation Court review panel is bound to employ the same standard of review of the trial court's decisions as applied by the Supreme Court and the Court of Appeals. *Id.* The review panel should not substitute its view of the facts for that of the trial court, and thus, if there is competent evidence in the record before the trial court to support its decision, then the review panel should affirm the decision, award, or order of the court. *Id.*

> Consequently, the review panel cannot go beyond its statutory mandate for review, which is limited to reversing or modifying "only on the grounds that the judge was clearly wrong on the evidence or the decision was contrary to law." § 48-179. If the review panel goes beyond this standard, then it has "acted without or in excess of its powers," one of the four grounds for reversal by this court found in § 48-185 (Cum. Supp. 1992).

*Pearson*, 2 Neb. App. at 712, 513 N.W.2d at 367.

## ANALYSIS

Our review is to determine whether the trial court's decision is clearly wrong or contrary to law. The review panel reversed the trial court's decision, finding, as a matter of law, that Valerie was an independent contractor, and therefore, by implication, so was Jennifer. Our review of the pertinent law suggests that we must use a two-step analysis to determine whether the trial court's decision was clearly wrong or contrary to law. First, we must determine whether Valerie was an independent contractor as a matter of law, and second, if she was not an independent contractor as a matter of law, whether there is evidence in the record to support the trial court's decision that Valerie was an employee of the Fremont Tribune, and therefore, by implication, so was Jennifer. A third question is Jennifer's status as a substitute carrier, and not a regular carrier. Regardless of Valerie's status, Jennifer may be an employee of Valerie, but not of the Fremont Tribune. Because we conclude Valerie was an employee of the Fremont Tribune, Jennifer's status as a substitute presents an additional question in determining Jennifer's relationship with the Fremont Tribune.

*Was Valerie an Independent Contractor as a Matter of Law?*

In its brief, the Fremont Tribune relies heavily on *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979), and *Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991), wherein the Supreme Court held as a matter of law that truckers driving their own leased-out trucks were not employees. These cases are workers' compensation cases involving over-the-road truckers who had leased their trucks to a trucking company under a formal written lease. As will be discussed later, although we conclude these cases provide the approach this court should follow in considering the issues in this case, they are so factually dissimilar to the case at hand that they are not an aid in analyzing the evidence.

The Fremont Tribune also relies on *LaFleur v. LaFleur*, 452 N.W.2d 406 (Iowa 1990), and *Taylor v. Industrial Acc. Com.*, 216 Cal. App. 2d 466, 30 Cal. Rptr. 877 (1963), cases in which the courts have held that a newspaper carrier was an independent contractor as a matter of law. See, also, *Hartford A. & I. Co. v. Indus. Acc. Com.*, 123 Cal. App. 151, 10 P.2d 1035 (1932); *Cable v. Perkins*, 121 Ill. App. 3d 127, 459 N.E.2d 275 (1984); *Lewiston Daily Sun v. Hanover Ins. Co.*, 407 A.2d 288 (Maine 1979).

In *Ross v. Post Publishing Co.*, 129 Conn. 564, 29 A.2d 768 (1943), a Connecticut court held a newspaper carrier was an independent contractor, but in *Scorpion v. American-Republican, Inc.*, 131 Conn. 42, 37 A.2d 802 (1944), the question of whether a newspaper carrier was an employee or an independent contractor was held to be a question of fact for the jury, notwithstanding a written agreement maintained by the publishing company establishing the relationship as a matter of law. In *Taylor, supra*, and *Fleming v. Foothill-Montrose Ledger*, 71 Cal. App. 3d 681, 139 Cal. Rptr. 579 (1977), the California courts held a newspaper carrier was an independent contractor as a matter of law. However, in *Cal. Emp. Com. v. L. A. etc. News Corp.*, 24 Cal. 2d 421, 150 P.2d 186 (1944), the California Supreme Court held there was substantial evidence to support the trial court's finding that certain newspaper carriers were employees. The court in *California Employment Com. v. Bates*, 24 Cal. 2d 432, 150 P.2d 192 (1944), held that

certain newspaper carriers were employees as a matter of law. From an examination of these cases, we conclude they each turn on their own facts.

The results of these cases vary, but the common thread in all of them is that the appellate court used the same basic "control test" to determine the status of a newspaper carrier which the Nebraska Supreme Court has applied to every case it has considered in determining the true status of an alleged employee. The different results come from the different facts in the cases. From our review of the case law from other jurisdictions, we conclude that in some situations, a newspaper carrier can be an independent contractor as a matter of law; in others, an employee as a matter of law; and in still others, the status of the newspaper carrier to the newspaper is a factual issue. The result in each case is dictated by the amount of control the newspaper maintains over the carrier.

In this case, the Fremont Tribune and Valerie entered into a written contract. The Supreme Court has held:

" '[W]here a written contract between the claimant and alleged employer exists, which not only denominates the relationship as that of independent contractor but also describes that kind of relationship, and nothing in the manner of performance by the parties is inconsistent with the relationship described, then the independent contractor is, as a matter of law, bound by the contract and is not to be deemed an employee within the meaning of the workmen's compensation statutes.' "

*Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 408, 476 N.W.2d 559, 562 (1991) (quoting *Knowlton v. Airport Transportation Co.*, 235 Neb. 96, 454 N.W.2d 278 (1990)). Accord *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979).

In *Anthony, Knowlton*, and *Stephens*, the Supreme Court found the relationship was that of an independent contractor as a matter of law, because in each case it found that there was a written contract which denominated the claimant's relationship to the alleged employer as one of an independent contractor and because in each case the court found that nothing in the manner of performance was inconsistent with the written terms

of the agreement.

In the case at hand, Valerie had executed an agreement on July 20, 1989, with the Fremont Tribune to deliver papers along the route in Cedar Bluffs. The agreement was entitled "Independent Carrier Agreement" and stated:

> The Company agrees to sell, and the Carrier agrees to purchase sufficient quantities of newspapers to cover the delivery schedule, together with such additional quantities of newspapers as the Carrier may require in conducting his independent business of selling and delivering the Company's newspapers.
>
> . . . .
> . . . It is understood that the carrier is free to engage in other business activities, but he agrees that the Company's newspapers will be delivered in a timely manner in accordance with said delivery schedule.

The Fremont Tribune furnished Valerie with a Carrier Hand Book, a subscription receipt card to keep track of collections from customers, and a collection calendar which set forth the days when collections must be made by carriers and the date upon which a carrier's balance for newspapers must be paid to the Fremont Tribune.

The Carrier Hand Book states that "you are not an employee of the Tribune but an Independent Contract Merchant." Notwithstanding that phrase, the tone of the handbook is directory. The handbook states duties and requirements the carrier must follow. For example, the handbook states, "The Fremont Tribune guarantees its customers home delivery of their paper before 5 p.m. . . . . Papers should be delivered before 5 p.m. daily and before 7 a.m. on Saturdays and Holidays." It states, "Don't rush through your route and take the chance of missing someone, . . . and deliver your route alone." In addition, the handbook states that the carrier is required to deliver "Shoppers" to all nonsubscribers along their route on Tuesdays, for which the carriers are paid on a per-piece basis. In addition, the carriers were told that it was possible that on certain days, the carriers would receive inserts, and that "[t]hese need to be put inside your papers before you deliver them." The handbook states that a carrier must "[n]ever let

papers pile up!!! If you notice papers piling up for more than 3 days, call in a stop."

The handbook also gives some "Suggestions for Collecting," but on the next page it states, "You may start collecting at the beginning of each pay period. In your collection book you will find a collection calendar, showing when you should collect and pay your bills. Always collect at the proper time." This handbook also states: "Every carrier must add to a savings account when they begin their route. Once the total balance of savings has been reached, you may discontinue this savings."

Finally, the handbook states, "Going on vacation and can't do your route? Find a substitute to do it for you. . . . Call the office with the substitute's name, address and phone number so we know who is in charge while you are gone." The Fremont Tribune also supplies its carriers with a Vacation Handbook for Your Substitute.

On July 20, 1989, Valerie and her mother also signed a "Carrier Deposit Agreement" in which Valerie agreed to deposit $10 per month "for indefinite months, or until the total deposit has been paid." There is no place in this document for a signature by anyone representing the Fremont Tribune.

In *Employers Ins. of Wausau v. Greater Omaha Trans. Co.*, 208 Neb. 276, 303 N.W.2d 282 (1981), the transit company and the cabdriver had an agreement which provided the driver was an independent contractor, but there was also an operations manual which provided instructions about procedures drivers were required to use and memoranda to drivers. The court upheld the compensation court's finding that the cab company exercised control over its drivers. Several practices of the Fremont Tribune are inconsistent with the relationship supposedly established by the Independent Carrier Agreement. Several statements contained in the handbook clearly give the carriers direction on the details they were to follow in delivering the Fremont Tribune's newspapers. These statements would support a finding that the Fremont Tribune kept control of all significant aspects of delivery. The carrier deposit, required by the handbook but not by the Independent Carrier Agreement, illustrates the degree of control the Fremont Tribune had as a matter of fact, and a degree of control generally inconsistent

with an independent contractor relationship. There are numerous other matters by which the Fremont Tribune exercised authority inconsistent with the agreement, but these items are considered in the next section, where we consider whether the evidence supports the trial judge's findings. We will not discuss these items at this time, but we do determine that Valerie was not an independent contractor as a matter of law. We do not, however, determine that Valerie was an employee as a matter of law.

*Sufficiency of the Evidence.*

■ The Nebraska Supreme Court has held that there is no single test to determine whether a worker is an employee or an independent contractor, but the determination must be made from all the facts in the case. *Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991).

> The determination of status as an employee, on the one hand, or as independent contractor, on the other, is a fact question for the trier of fact. The review is to see if sufficient competent evidence warrants the factfinder's conclusion. Such a conclusion will not be set aside unless clearly wrong.

*Employers Ins. of Wausau*, 208 Neb. at 278, 303 N.W.2d at 283. The question before the trial court was whether all the evidence regarding the relationship between Jennifer and the Fremont Tribune indicated Jennifer was an employee or an independent contractor. Upon review, we must view the evidence in a light most favorable to Jennifer, as the review panel should have done. *Wiese v. Becton-Dickinson Co.*, 239 Neb. 1033, 480 N.W.2d 156 (1992); *Pearson v. Lincoln Telephone Co.*, 2 Neb. App. 703, 513 N.W.2d 361 (1994).

In *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984), the Nebraska Supreme Court set forth a number of factors to be used to consider whether a worker is an independent contractor or an employee. The first of these factors is the control of the alleged employer over the alleged employee. The court stated:

> "Generally, control, or the right of control, is the chief criterion in determining whether someone acts as an

independent contractor." . . . "However, even the employer of an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms."

*Id.* at 804, 359 N.W.2d at 762.

When the evidence is viewed in a light most favorable to Jennifer, the record supports the trial court's finding that the Fremont Tribune exercised control "in every important respect" over the carriers. The trial court noted that the carrier handbook provided carriers with detailed instructions which they were expected to follow. In addition, the Fremont Tribune fixed the price which the carriers were to charge the subscribers for delivered newspapers. The Fremont Tribune also dictated when the carriers were to collect the payments from the subscribers, and carriers were forbidden to collect at any other time. We find there was sufficient evidence to support the trial court's finding that the Fremont Tribune exercised control over its carriers.

The second factor is whether the person employed is engaged in a distinct occupation or business, that is, whether the person offers a similar service for other businesses or persons. *Eden, supra.* The trial court found that the Fremont Tribune was the only paper delivered by Jennifer and that the Fremont Tribune's publisher admitted that the carriers are an integral part of the Fremont Tribune's system of delivering its newspapers to its subscribers. The trial court found that Jennifer and other carriers were not employed in a distinct occupation, but were employed to further the newspaper's business. Viewing the evidence in the light most favorable to Jennifer, we find there is sufficient evidence to support the trial court's finding.

The third factor to be determined is the level of supervision given to the worker. *Eden, supra.* When viewed in favor of Jennifer, the evidence shows there was supervision of the carrier's work. If the carrier did not perform the way a Fremont Tribune customer desired, the subscriber was instructed by advertisements in the newspaper to contact the Fremont Tribune. The district sales manager for out-of-town routes, who admitted her job duties included "supervising over 70

paper carriers," testified at trial that it fell to her to pass on complaints to the carriers and to work out problems customers were having with the carriers. There was sufficient evidence to support the trial court's finding that the Fremont Tribune supervised the carriers.

The fourth factor is the skill required to perform the work. *Eden, supra*. The less skill required, the greater the indication that the work is done by an employee rather than specially skilled independent workers. See *Employers Ins. of Wausau v. Greater Omaha Trans. Co.*, 208 Neb. 276, 303 N.W.2d 282 (1981). The trial court found that little skill is needed to be a carrier, stating that the Fremont Tribune's advertisement for carriers, which reads "HEY KIDS! . . . If you're 10 years or older . . . WE NEED YOU," is "a complete exposition of this factor." There is sufficient evidence in the record to support the trial court's finding.

Fifth, " 'That the worker supplies his own materials and tools may be indicative of contractor status.' " *Eden*, 218 Neb. at 805, 359 N.W.2d at 762 (quoting *Voycheske v. Osborn*, 196 Neb. 510, 244 N.W.2d 74 (1976)). The trial court found that the Fremont Tribune supplied the workplace, by assigning and configuring the paper routes. In addition, the trial court found that the Fremont Tribune supplied the product, including the newspapers, inserts, and "Shoppers," which were required to be delivered to nonsubscribers and which the newspaper, rather than the nonsubscriber, paid the carriers to deliver. The trial court found that the Fremont Tribune also gave the carriers, at no cost, collection calendars, collection cards with tear-off subscriber receipt forms, collection books, introduction pads the carriers used to introduce themselves to potential new subscribers, " 'vacation handbooks' " for substitute carriers, " 'vacation time' " forms the carriers used to notify subscribers that their carrier was going on vacation, and " 'free sample' " newspapers to use to solicit new subscriptions. There is sufficient evidence in the record to support the trial court's finding that the Fremont Tribune supplied substantial " 'instrumentalities' " to its carriers to assist the carriers in performing their jobs.

Sixth, the length of time which a person is employed is

another factor of the test. *Eden, supra*. The trial court found that Jennifer rendered continuous, albeit part-time, service, which indicated an employment relationship and not an independent contractor relationship. The court noted that while the Independent Carrier Agreement stated that the contract could be terminated by either party upon 24 days' notice, in practice, the Fremont Tribune terminated carriers without the specified notice. There is sufficient evidence to support the trial court's findings.

The seventh criterion deals with the method of payment. " 'Normally an employee is compensated while he works. An independent contractor's compensation, on the other hand, usually depends upon whether he makes a profit from the contract.' " *Eden*, 218 Neb. at 806, 359 N.W.2d at 763 (quoting *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979)). The record shows that the Fremont Tribune set the price the carriers could charge and set the price at which the carriers were "charged" for the papers delivered to the subscribers. The trial court found that Jennifer was paid on a piece rate, "measured by the difference between the prices of each paper delivered, and by the piece rates paid for delivering the Shoppers" to nonsubscribers. "[P]ayment of wages on a piece or quantity basis is not inconsistent with the status of an employee." *Riggins v. Lincoln Tent & Awning Co.*, 143 Neb. 893, 896, 11 N.W.2d 810, 812 (1943). There is sufficient evidence in the record to support the trial court's findings.

Eighth, whether or not the work performed is part of the regular business of the employer is another factor to be considered. *Eden, supra*. The record shows that 82 percent of the Fremont Tribune's circulation was received by its customers through home delivery. Of those papers which were home delivered, the record shows that 64 percent were delivered by carriers on foot or bicycle. The trial court found that in light of these facts, "It can scarcely be contended that delivery of its newspapers is not 'a part of the regular business of' the Tribune." Viewing the evidence in the light most favorable to Jennifer, we find there is competent evidence to support the trial court's conclusion.

Ninth, the court held in *Eden* that "we have repeatedly said

that the failure to withhold taxes indicates that an independent contract exists." 218 Neb. at 806, 359 N.W.2d at 763. "The deduction of social security taxes and the withholding of income tax tends to indicate an employer-employee relationship, while the failure to do so is a contrary indication." *Stephens*, 205 Neb. at 20, 286 N.W.2d at 425. The evidence shows that the Fremont Tribune did not withhold income and Social Security taxes from the carriers' earnings. However, since federal law exempts the normal withholding of income and Social Security taxes from earnings of a newspaper carrier under the age of 18 years, this fact is not significant to this case. See I.R.C. §§ 3401(a)(10) and 3121(b)(14) (1988). State law adopts that exemption. See Neb. Rev. Stat. § 77-2753 (Cum. Supp. 1994). The factor does not have its usual significance.

Finally, the tenth factor to consider is whether the parties believed they were creating a master-servant relationship. *Eden, supra*. The trial court found:

> This is the weakest of the indicia. The carrier, Valerie Brauner, believed the carrier was an employee while the publisher . . . believed the carrier to be an independent contractor. It is beyond sophistry and closer to outright dishonesty to characterize a 10-year-old party to a contract as a "little merchant" and thus an independent contractor. The concept of "little merchant" is often accompanied by notions of self-reliance, independence, responsibility and perseverance. These admirable qualities can be inculcated to an employee as well as to an independent contractor.

In view of the factors set forth in *Eden*, we find that there was sufficient evidence in the record to support the trial court's finding that Jennifer was an employee of the Fremont Tribune for purposes of the Workers' Compensation Act.

### Substitute Employee.

Jennifer did not deal directly with the Fremont Tribune, but, rather, agreed with Valerie to divide the route which Valerie agreed with the Fremont Tribune to deliver. We shall first consider the significance of this relationship.

The trial court found that Jennifer was a substitute employee

of Valerie who became an employee under the Workers' Compensation Act because the Fremont Tribune knew of and acquiesced in the hiring of Jennifer as a substitute. The trial court found that the Fremont Tribune had actual knowledge that Jennifer was assisting Valerie on a regular basis with Valerie's paper route. In addition, the trial court found that the Fremont Tribune directs its carriers to obtain substitutes when needed.

Our review of the record reveals that it is not devoid of any evidence of a contract of hire or contract of employment. The Fremont Tribune encouraged its carriers to engage substitutes to help with their routes and provided brochures to the carriers to use when training substitutes. Further, in her letter to the subscribers, Valerie informed them that Jennifer would share in the delivery of the papers, but that to have the paper held or stopped, the subscriber must call Valerie, "as this is still my responsibility."

Viewing the evidence in a light most favorable to Jennifer, we cannot say that the trial court was clearly wrong when it found Jennifer was a substitute employee.

Thus, the question before us is whether Jennifer, as a substitute employee or subemployee of Valerie, is covered under the Workers' Compensation Act. The Supreme Court recognized in *Anderson v. Bituminous Casualty Co.*, 155 Neb. 590, 52 N.W.2d 814 (1952), that a person whose services were secured by a county sheriff was a county employee for purposes of the Workers' Compensation Act. The person engaged by the county sheriff had been asked by the sheriff to participate in a search for an escaped prisoner. The *Anderson* court noted that county sheriffs were authorized by statute to " 'call any person to their aid; and, when necessary, the sheriff may summon the power of the county.' " *Id.* at 595, 52 N.W.2d at 818. It is recognized that "[a] person working as a substitute for another may be an employee under a workmen's compensation act, at least where the employer knows of, and acquiesces in, the substitution . . . ." 99 C.J.S. *Workmen's Compensation* § 74 at 298 (1958). See, also, *Veit v. Courier Post Newspaper*, 154 N.J. Super. 572, 382 A.2d 62 (1977) (newspaper clothed newspaper carrier/employee with the authority to engage a substitute;

substitute therefore covered under workers' compensation act); *Bobik v. Indus. Comm.*, 146 Ohio St. 187, 64 N.E.2d 829 (1946) (if a master expressly or impliedly assents to an employee's hiring an assistant or substitute, assistant occupies the position of an employee of the master). The principle underlying these cases "is not so much one of compensation law as of the familiar agency doctrine of implied authority." 1B Arthur Larson & Lex K. Larson, The Law of Workmen's Compensation § 48.17 at 8-478 (1994). Therefore, since Valerie was an employee of the Fremont Tribune, Jennifer, as a substitute employee of Valerie, is covered under the Workers' Compensation Act to the same extent as Valerie would have been had she been doing the work.

## CONCLUSION

Viewing the evidence in a light most favorable to Jennifer, we find that there is competent evidence to support the trial court's finding that Jennifer was a substitute employee or subemployee of Valerie and that Jennifer was an employee, not an independent contractor, of the Fremont Tribune. We therefore must reverse the review panel's order, as its decision exceeded the scope of its review, and reinstate the award of the trial judge.

REVERSED.